All right, Mr. Sanford. The issue before the court today is whether a jury is allowed to decide a dispute between private citizens about their alleged violations, or when against each other, with the government. And we submit that the jury is the proper party for that. So false claims, an act of tarnation case, Mr. Johnson worked faithfully for Raytheon for over 30 years. You are going to address our jurisdiction? Yes, you have jurisdiction. That's our first, usually our first inquiry. You have jurisdiction because Mr. Johnson is not disputing anything that the Navy did. We are not disputing any decision by the Navy. We disagree with it. We say it's not right. We say it's based off of false information. But we are not, we did not bring a lawsuit against the Navy. We are not saying, Navy, please undo what you did. There is no claim against the Navy, unlike 90% of the cases that they cite deal with people working for the FBI, another agency that says, hey, agency, you made the wrong decision. We are not doing that. So this court does have jurisdiction. We don't believe that Egan applies to this situation. Egan, again, was someone that was going against a government agency for a violation. And they said, look, you can't deal with that if you're trying to overturn a security clause. In this case, it's a disputed fact whether or not the security clearance was revoked. It was issued by the Department of Defense. The Department of Defense is the governing body that makes the predictive judgment based on their discretion, to give somebody a security clearance. And there are actually due process protections with the DOD. There's notice and hearing. If your security clearance is going to be revoked, they notify you. You can appeal it. There's a process. Your client's with Lockheed now? Pardon? Your client is with Lockheed now? With Lockheed, with a security clearance. I guess I have two principal questions. One's legal and one's factual. When you say 90 percent of the cases, let's talk about that other 10 percent. Do you dispute that Egan, the Egan bar, has been extended to private sector contractors of the government? Not at this circuit. It's never been done here. So are you claiming that we should stop, we should interpret Egan to disallow the bar in any case where the employee is the employee of a private sector individual? And if that's your argument, what's your best other circuit authority? It may be what Egan, in the context of Egan, but do you have any circuit authority to not extend it? I don't think I have circuit authority that should be extended, but I will tell you the best argument is Rattigan. But again, that was not a private company, right? We have a Ninth Circuit case that deals with Raytheon. It was a private contractor. In that situation, they just said, oh. The Ninth Circuit says we're hesitant, we're skeptical, but they actually – I don't see a circuit that has yet said we will do it to contractors with the government. Do you agree? I agree. Okay. So if Egan applies, then I guess this then gets – and I don't want to simplify your case, but it gets down to the second point you were going to make, which is is there a fact dispute? Certainly in the hearing a year ago exactly to today, you both disagreed vehemently, but then the district court's opinion quotes the security officer for this program. Yes. Quoting a report, which we objected to as hearsay, right? So they say, oh, there's a report that says – So we've got an exhibit that says yes, revoked. We've got that individual who says revoked. I have an objection based on hearsay, and I'm saying it's a disputed fact. I'm also saying it doesn't matter, but – How does it not matter? Isn't that sort of the heartland of Egan? Because we're not – even if the security clearance was revoked, it doesn't eliminate whether or not there was retaliation before the investigation. Yes, I mean the broad theory there, though, that's sort of garbage in, garbage out. Raytheon presented facts that led to an incorrect ruling. Right. But it's a ruling. We can't look at how the Department of Defense investigated it. So even if they lied to the department, it would seem that the eventual factual outcome is revocation of national security clearance, and that's a dischargeable circumstance. We can't – It would be dischargeable if that was the but-for reason, right? That's disregarding all the retaliation leading up to the termination. So just talking about the termination but-for, that decision, and his protected activity. So under Bostock, you can have many but-fors as long as it's necessary. So if the termination is for the alleged revocation of security clearance and retaliation for the protected activity, we have a case. It could be both. And there are plenty of jobs that he could have had that didn't require access to that program at Raytheon. Right, but that gets back to – And that's the – that's another case. This was a security-related concern that only led to removal from the program. But if it was a full withdrawal of any access to security information, the termination – do you have any similarly situated person at Raytheon that had the Boeing computer, had all that stuff, that also had their security clearance revoked? No. Okay, so that – But I did have plenty of comparators that did the same thing that he did. It did not have their security clearance revoked. I know. You monitor them, they report them, and when they report them, the government – Yes. – in its black box – Yes. – and I know you dispute this fact – Right. – ultimately concludes he can't touch security – Right. – national security information. Raytheon says, well, that's what we – that's what all our people do. Right. Radigan, that was the same issue, only not even a private employer. Another coworker wants to retaliate, turns him into the security, gets revoked, and Radigan says you can still sue if the initial information was made and turned in knowingly false. So – and we make that – I know that – Sure, I'm mistaken, but I thought in Radigan, ultimately, there wasn't a revocation, right? There wasn't. In my – I don't know if there was, actually. Well, that – But there – but the – I'll have to look at that. But the issue was in Radigan is it didn't matter. It didn't – they had jurisdiction, because it doesn't matter revocation or no revocation. If the person is making a false report that starts the investigation, you have a claim. There is jurisdiction. That's within an agency, and what we have is a private entity making a false report to a government agency. So just back on what I think of as the determinative fact question, if there were a fact question, my view is you would prevail. Are you saying the record shows conclusively it wasn't revoked? Are you saying that the record leaves it uncertain? Are you saying it's irrelevant as a matter of law whether revocation occurred, or are you saying this ties to your 56D argument? You need a discovery to know if it was revoked. Which of those four is your primary argument? First, it's all of the above. Okay, well, if it's all of the above, counsel, where do you point to in the record to show conclusively they didn't revoke it? Because they haven't met their burden of proof. All they have is one hearsay statement. And the proof is a document from the DOD that says it's revoked. Zero evidence that that's happened. So not my burden to prove that it happened. Right? They can say it happened, but I don't think that's my burden. I thought, what's his name, Lynn Sharp at Raytheon, Brian Holsler at the government, and the exhibit NCIS. But the exhibit is a report by NCIS that it happened. It's just a little statement at the bottom or in the middle of a report that it happened. So it's not even clear if they're talking about the clearance to the program or the actual security clearance issued by the DOD, which they don't decide. The DOD decides. There is a document that the DOD says, look, it's revoked. Where is that document? It's not there. It's just a hearsay statement in a report in a sentence at the bottom of one page. And that's what they rely on. It doesn't even say who said that. Zero is admissible evidence. So and for sure it's a fact issue. Let's go back and let's get the official report from the DOD. Let's go back and find out, did it really happen? When we asked the DOD, they didn't come back and say it was revoked. I thought in the 56D order, I thought that he specifically invited you. If there's any fact that might, Judge Fitzwater did, any fact that might illuminate my jurisdiction, tell me and you could get that targeted discovery. Okay. Well, I guess if you're talking about the, and you're talking about specifically the DOD document, I couldn't get a document that says it still exists or doesn't exist from the DOD. We asked for it. We just got it back and said, here's your status and you say revoked. So, and is that hearsay? Maybe there's a way I can get that judicially noticed in front of the judge. I don't know. But, but I have plenty of other facts that I could get in front of the judge that I was not allowed to get in front of the judge. Right? That go to whether or not any of this happened, whether or not any of the violations happened. So, the fourth argument I suggested to you was, even if this document went under a budget and established it was revoked, do you have a legal argument that even with revocation, because it's a private employer, that wouldn't matter? Yes. It seems to be, they say it's been around the 28 days citing especially the Fourth Circuit's Mallory decision. Yeah, so the Mallory doesn't even follow. Right? Right? The Fourth Circuit doesn't want to follow Rattigan. Rattigan says you, that the security clerk doesn't matter. You can still go against the entity that made a false report that started the investigation to, that led to whatever it was. Kavanaugh dissents and says, hey, that's a distinction without a difference. I disagree. We do that all the time in interference cases. We do it in perjury cases. In interference cases, the third party that lands the blow of the adverse action, that decision is not ever disputed, even if it's wrong. It is the interference that leads to that decision of the third party to land the blow. In the perjury case, if the perjury leads to a lawful conviction or some other judgment, that's not, there's no jurisdiction, there's no claim to overturn that, but the perjury charge still goes on. That's what Rattigan is saying, is that you can't make a false statement. That distinction is even sharper when, unlike Rattigan, we have a private entity that's making a false statement to the government. And we've got plenty of, we have refuted and shown that statement after statement after statement made to the Navy was false. Leading up to that first year where they were just behind the scenes suspecting. All of that was false suspicions that they knew was false. In my 56-D, I've got about a minute left for the 56-D. The other issue is with the 56-D. I filed a motion to compel. The court basically said, and Ray Dionne didn't try hard enough on the 56-D. The 56-D simply says, I have to show specific facts that I can't present specific reasons and I can't present facts that's essential to justify opposition. I filed a motion to compel. It was granted. They didn't comply with the motion to compel. I'm ready to have sanctions and contempt. They're arguing classified, classified, which we say is a smokescreen. Initially, they said his weekly reports were classified. Then they admit, oh, they're not classified. They're on a classified system. It's like saying, oh, they're in a file room. You can't go in unless you have classified clearance. But you can go in and pull out all those non-classified documents and give them out to us. That took over a year with TUI process. I didn't think I needed to make. We're having huge discovery disputes. The judge says, look, why don't we do this? And Ray Dionne suggested, why don't we replicate discovery? So back off on all the discovery disputes. And in reliance on this, I said, OK, judge. The judge says, look, Mr. Stanford, let's split this up. And I'm still going to give you a chance to argue all your discovery. If you can't do your discovery, I'll bet you can't argue it in 56D. So relying on that, we back off. We say, OK, we'll do the discovery that they let us do. And then we'll make our argument in 56D. We do that. And then they say, well, that's not sufficient. I should have filed a motion to compel again. They're already not complying with the court order. They say I didn't put reasons in there. In the record, here's one of my reasons. Depositions of coworkers would verify that they did the same activity for which Mr. Johnson is accused of being a security violation. That's one of several places I actually say what I mean. The 30B6 person won't even answer questions about whether or not they even know that Mr. Johnson made any violations at all. I can't give you any of that. All right. Thank you, Mr. Stanford. You have preserved your rebuttal time. Mr. Blanchard? Thank you. May it please the court. I'm Charles Blanchard for the Appellee Raytheon Company. I'd like to start by explaining what exactly the Navy found. The Navy found that despite the fact that Mr. Johnson had denied it in the interview, that on 100 occasions he used a program called Wireshark on a system for which he thought designed. Wireshark, there's two different servers, one that Wireshark was allowed and one of which it was not. He used it 100 times. And it's important that Johnson denied that in his interview, but the Navy found otherwise. And as Mr. Gary Lamont testified in the record, this kind of serious security violation is not common. He could only think of two or three occasions in the past when it occurred, and in every single instance the person was terminated. That's a hotly debated story, right, because there's no dispute that he worked for your client for 30 years, and then there's no dispute that he was a whistleblower at a rather extreme point in the lives of military officers, fraud on the government. And then right after that, he's fired. He's monitored first, and then his theory is they send it up to the government and all of a sudden Raytheon can turn around and say, you can't look at any of the possibility that we were telling you. But here, Your Honor, if you look at the Egan Doctrine and how it's been applied, the Egan Doctrine and the Carr decision in the Fourth Circuit, the Hill decision in the Eleventh Circuit, and then the Wilson decision in the Federal District, the courts all face a very similar claim. Yes, I'm not going to contest the security violation. I'm going to contest what started it because that was based on false statements, and all three of those circuits said no. Once there's been a finding by the government that the allegations are true, you can't argue. We're not going to allow it. We don't have sufficient jurisdiction to argue that the initial allegations are false. Okay, those are those circuits, but we're in the Fifth Circuit, and we have a published decision toy that has said no court has extended the Egan bar beyond just allegations found to be true. It's got to be a national security revocation, and then we emphatically said we declined to do so. So the Fifth Circuit has pretty much closed the door to allegations made by a private employer that the government finds are true. Somehow that means Raytheon's above the wall. I think the Mowry decision... But Mowry's poor, so let's stick with... Right, but he distinguishes toy, Judge Wynn, of the Fourth Circuit in ways that I think make sense. Toy involved a building access decision, and it was not done by trained security professionals. It was really just done by the supervisor. In contrast here, we have Lynn Sharp, who's a trained security person at Raytheon, who makes the judgment that she's required to make the report. She hands it over to the Navy. Brian Hostler, who's the Navy security officer, makes the judgment that the allegations are so serious they merit a criminal investigation, so he brings in NCIS. And then there's a period of a nine-month investigation. And the very kinds of people that Egan is talking about, making predictive judgments for which there is no judicial review and only is left in the executive branch, is exactly what occurred here. No, but I read Egan very differently. I mean, that's 30 years ago, and the Supreme Court is pretty much creating a separation of powers argument, saying, MSPB, your judges and your board members, you work for the president. You can't second-guess Article 2 president's security decision. Somehow then later at the circuit level, the ship jumped, and it suddenly becomes Article 3 courts. You can't look either. I think that ship is sealed, right? Even in our court. And even the D.C. Circuit. The Radican accepts that as well. Right, but the Supreme Court's never made this leap that benefits the defense industry. Three percent of our GDP, tens of thousands of contractors, hundreds of thousands of employees, and all these companies now can hide behind the Egan bar, do what they want to do, give it to the government. If the government agrees with allegations, no one can look. I think this is a way... I would look at this, Your Honor, is this is about who is best positioned to evaluate these kinds of judgments. Right, but federal courts are good at then evaluating whether or not those are correct or not. Although that's not what the other circuits have said. Other circuits. But you agree with me that the Fifth Circuit has never said Egan applies against Article 3 review? Or you would say, no, we've already... I believe the Paris decision on this circuit was in Article 3. And would you say the second level, because I think that we have foreclosed that view of Egan, but is there any Fifth Circuit case that has yet said the Egan bar applies to employees of private sector companies? No, I think the only Egan decisions in this circuit are toy and Paris. But there are numerous examples. The Boeing decision in the test circuit. And then there are several district court decisions like the Alkazi decision in the Eastern District of New York. The Dine Court decision in the District of Massachusetts. And there's a recent decision in South Carolina, all of which deal with the circumstances. And the reason is this. Egan is not an issue preclusion doctrine. It is not an immunity doctrine. You're not immunizing government decision-making. Instead, you're saying that it's a separation of powers decision. We are going to leave to the executive branch, unless Congress says otherwise, we're going to leave to the executive branch security determinations such as that here. As to its employees? That's not what other circuits... Because here, imagine a scenario where the Navy says, this guy is a danger. Yeah. If you allow it as to... If you allow the courts to now suddenly second-guess the Navy decision just because it comes to the horizon of a private employee, you have exactly the problem you have with executive branch officials. At that point, the separation of powers issue is still joined, is still second-guessing the executive branch. So you're saying even if it were garbage, even if Raytheon wanted to retaliate, as long as the government itself separately has concluded he can't get access, then the discharge decision can't be reviewed. I think the answer is yes, and the Rattigan decision offers a good contrast. The Rattigan decision, in fact, the FBI had investigated and found that the allegations were false. Right. Did you argue at the hearing in front of the... No. I did. You did, because I think I remember you said, okay, well, that's distinguishable. We accept Rattigan if the government absolves the individual. Right. What I'm wondering, I think that's pretty much where it is, except I would say no, the only way the Egan Bar extends to a private employer is if the government actually chooses not to revoke a national security clearance. That's the very limited orbit. Well, I would say we go beyond that. I know you do. Because, for example, in this case, the initial decision by the Navy dealt with an access to the special access program. The Navy doesn't have the authority to take away any of the security clearance. But it does decide who has access to that program. And that is really about access to classified information, which is what about the Egan doctrine is about. So even if the security clearance had not been revoked, the fact that there was a security determination about access to the special access program, I think that's still the Rattigan exception that we're not applying. If I disagree and I interpret toy to tell us it's exclusively extended to the private sector when the government's revoked national security clearance, would you still win? Is there no disputed fact in the record? The record is clear that his clearance was revoked in the record. The challenge here, to be very honest, the challenge is to know whether that was because of the adverse findings or whether it was because he was no longer employed. Both would have been ground. So we don't know the reason for the revocation. In September of 2015? Right. I'm gone. So, but I don't think toy goes as far as to require a security clearance determination because that was not an issue in toy. And I think again, Judge Wynn's decision in Mallory, I think does a good job explaining. But Mallory is a guy who's working for the CIA. Right, but I think he's trained. He had top secret and then they did the mental evaluation and they don't give it to him. They refused it. That sounds to me like the functional equivalent of a national security record. Right, but I think what I'm looking at is his discussion of toy and the other circuits that deal with the scope of the Egan documents. Is it just pure security determinations or is it a little bit broader? And he says, you know, toy is there, but toy is very different. And he also points to two other courts that have dealt with the Department of the Energy's human reliability kind of determinations that do not determine who gets access to nuclear weapons. And he says, in those cases, it's very akin to a national security determination. It's a predictive judgment. It's by the executive branch, by people who are specializing in it. And in that case, there is, the Egan document implies, while in toy where none of those factors occur, it's really a supervisor making a business of building access decision. It doesn't apply. And here we're more akin to the human reliability. It's access to classified information. It's by the executive branch and it's by people who specialize in this. So while it's, so it's even without a security classification decision, it's still, it's within the scope of the Egan document. And if the court were to hold otherwise, I think you would be creating a circuit. Does the government ever absolve people though? Is that actually a limiting principle? Your interpretation of that? I don't understand your question. Well, let's say it goes into the government's black box that can't be looked at. And they don't revoke his national security. They just say, we don't want him working on this program. We've got some much lesser concerns specific to this program. And then everybody else, assumed for the sake of argument, who used the wire shack and used the boring computers, they get put on different projects. But it's fine. The court still can't look. I think, you know, I think there's another case, the Ninth Circuit. It makes very clear that if a plaintiff's theory of the case does not question the Navy determinate, government determinations, then maybe it doesn't apply because you're not, you don't have a separation of powers issue. But in this case, if, you know, at the district court level and in this briefing, the theory of the case is the Navy got it wrong. They got it wrong because Raytheon lied, but the theory of the case is still that the Navy got it wrong. And there's no evidence in the record to support this idea that the monitoring here that led to the report to the Navy was any different than what was done on anyone else. Because every, as even Mr. Johnson- Did they report anybody else that had a bone injury? There are, you know, reports of security violations are not uncommon, but they don't always, they don't, and I don't know if- Anybody else on the ACT program that had a bone injury? I don't know. I don't, I don't know the answer to that question. I think a theory puts in the record it's the only guy that gets reported is the guy who was the whistleblower. Although you have the decision maker here, Ben Sharp, who testifies, as does the decision maker, Gary Lamont, at the determination stage, that they had no idea about the alleged protective activity. And there's no evidence- Let's say, essentially, these facts. Ray Theon's got a bunch of employees on this highly, very important program, the ACT. And then a new person, Lynn Sharp, comes in, she sees a bunch of them are using Boeing computers. And they monitor them, they confirm it, they report it to the government. And the government says, we're not going to investigate further. But this judge, Johnson's, courts can investigate. We have a ruling. At that stage, do you have a record where you can, you can accept the Navy findings? The Navy declines to investigate. Still, court reviews. But that's not, that's not the record. I know it's not. But then, let's say, I just want to know what your limiting principle is. Let's say the Navy decides to investigate, and they say, we've got concerns, we prefer you not having to work on this program. But we're not revoking any security claims. You think the Egan Bar means if they still fire him? It's a reason, those are the reasons for the firing. If, if the, if, for example, the only program for which he was qualified is this program, then you might, then you have to be legitimate a basis. But there still has to be, there has to be, you know, a non-contextual basis for firing. And so, it couldn't, so it really depends on the facts. Yeah. But here, you say, first, the facts did lead   other circuit law says that any security related determination is sufficient. Yes. Yeah, the human reliance is sufficient. And, and, and, and the, and the, the probability decisions that are discussed. And, again, I mean, TOI, TOI is, is, is, is, is, you know, very different because in TOI, it really had none of the initial that you see in national security determinations. But there's a whole, and MAORI itself didn't involve a national security clearance determination. It, it, it itself was something different. I just, it was predictive, it was by the executive branch, and it was done by people who were experts. I've asked a lot of questions. You, and you've answered very helpfully, but please, sometimes... Yeah, I, I think it might be, might now be useful to sort of turn to the merits, in case you don't like what I'm saying. No, no, it's been very helpful. But I, but I think on, on, on, I think the important thing here is, even if even if it doesn't apply, on the facts of the case that we have here, we still prevail, and that's because the two key elements of this case that we   merits,      evidence, and the merits of the evidence. And the merits of the evidence are the merits of the evidence that is in the case. And he talks about how he talked about these other facts, but he never once asked Humphrey to talk to him. So we have no evidence other than the decision maker that he had no knowledge of the alleged protected activities. The activity occurred years before. And second, on the monitoring issue, there's no evidence on the record that the monitoring here was any different than it was done before. He talks about how other people also use wire sharp. Wire sharp is allowed in what's called the PL1 server. It's just not allowed under the PL2. He offers no evidence that people use the wire sharp. But the concerns about Mr. Johnson went beyond wire sharp. Lynn sharp in her declaration talks about other matters that were concerning such as the fact that he asked for a dual computer which was security violations. She mentioned several others as well. Even if you look at the long list of 21        other half are completely true. The other half are completely false. The other half are completely true. The other half are completely false. He didn't even ask Raytheon for those depositions. For others he had asked and our response was explain how this is relevant to the motion and we may consider and he never got back to us. In addition to the reasons that the judge gave for the rule 56 decision which was eminently reasonable, he just simply failed to pursue the discovery. Judge, you have a question? I guess I would loop back if you finished. Was the objection to the NCIS document urged? I don't recall that it was. It may have been said but I don't recall. Do you recall whether or not there was the argument about an inference that could be drawn from Johnson saying he never had a chance to contest the security violation but I can't recall that it was made specific to the lack of notice. Thank you. Loop back to counsel's argument about the 56D. He's pressing hard at the fact issues. You know, about 56D, he said he didn't get two shots at it but he pressed hard to persuade us that there are fact issues below, et cetera. So, would you just respond to that before you come back up? This was an extraordinary method. I   important to remember that this is not the only discovery. During this period the judge required us to write a detailed posting of what we were going to argue before discovery. So, he had a roadmap as to what we  to argue before discovery. I don't know what he was asking. I asked for something like 21 depositions. I inadvertently left off one person, Ms. Humphreys. I didn't. I started with a rule 202, Texas pre-suit deposition to try to get to the bottom of it. They thought that was classified. The state court judge said I'll give you an interrogatory which is not allowed under the rules. Then filed a lawsuit. For the first time a couple years into the lawsuit, he didn't know what his violations were. I filed a motion to compel. It's granted. 55 things they're supposed to answer including personnel files. Don't get them. Going back seven years, after a fight for a couple years, I get almost a year's worth. Several other things I don't get. It's an order from the court. Moving forward, the judge says, okay, let's just do this bifurcated thing. I'm telling them why I want this. They're arguing because I didn't respond. I had heated conversations over the phone repeatedly why I need all this. Then we take these depositions and basic questions, does Raytheon have possession of data that can show who downloaded the software? Corporate representative, do not answer that question. It's very simple to find out who downloaded the software. Supposedly he downloaded illegal software, any person with basic IT can look at the files and see who downloaded it. They will not answer that question. Does Raytheon have any facts to dispute Johnson's position that he did not introduce the software? Do not answer that question. Whether Ms. Sharp, corporate representative, or individual, actually looked to see who downloaded Lockshark, do not answer that question. Over and over. I laid all this out, including reasons such as depositions of co-workers would verify the same type  software that Johnson used. I have two or three other explanations. I just want to get the flavor of what you are saying. The district court has three different opinions here. This thing is stretching out over a pretty broad period of time. I think we got where you are. If you want to shift to some of the other matters. Let me go back to the Egan issue. Radigan, the outcome is different. It is internal. The D.C. court said a jury is just as competent to determine whether someone intentionally reported  false information as an agency. You said standing up that you thought Radigan led to eradication. The correction is a critical fact. When the government doesn't trigger the correction, it means no national security clearance. Setting aside that there is no due process in that decision-making process, issue preclusion, whatever. Setting aside that. They said there is no right to a security clearance. There is a right for every person not to be retaliated against by their employer. Where do those meet? If we go back and have a trial and the jury says yes, they made false statements, yes, when they said you can't talk to the Navy, that's retaliation. When you turned over false information to the jury, when it comes back and you do your own sham investigation independent from the Navy and you know that it's all false or there's indirect evidence or let me go do the discovery to show it, and the jury comes back and says, oh, yes, Raytheon retaliated against that. That jury verdict is not going to change security clearance at all. We're not contesting that at all. Thank you. Thank you, sir. All right. Thank you, Mr. Sanford and Mr. Blanchard for your briefing and your argument in the case. We'll take the case under submission.